UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| B.W., a deceased minor, through representatives LATOYA CARNEY, and BYRON WILSON, SR., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF NEW ORLEANS, SHAUN FERGUSON, ALEX MIKKELSEN, JONATHAN BROOM, JEFFREY HARRINGTON, ALEX FLORIAN, WILLIAM HERY, COLBY STEWART, ABC Insurance Companies, DOE DISTRICT COMMANDER, and DOES 1-10, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## COMPLAINT

1. This case is about a group of New Orleans Police Department ("NOPD") officers who repeatedly engaged in unauthorized police chases.

2. Those officers covered up their actions by turning off their in-car and body-worn cameras.

3. NOPD failed to discipline any of the officers until two children and one adult died.

4. One of those children was sixteen-year-old B.W.

5. According to NOPD Chief Shaun Ferguson: "Three lives were lost as a result of a violation of policy, poor decision that was made and not just that poor decision that was made that night."

6. NOPD has admitted B.W.'s death was the result of its officers' decisions.

7. Now the parents of a dead child seek accountability for those decisions.

### I. INTRODUCTION

8. On the evening of March 20, 2019, six New Orleans Police Department (NOPD) officers initiated a vehicle chase, ultimately causing the deaths of 16-year-old B.W., 14-year-old C.C., and 54-year-old Schwann Hebert, as the chased vehicle crashed into a beauty salon, which erupted into flames.

9. The officers' decision to chase B.W. and C.C. was especially egregious considering a federal judge's had issued an order banning vehicle pursuits like that one.

10. During the pursuit, New Orleans Police Department Officers Alex Mikkelsen, Jonathan Broom, Alex Florian, and Jeffrey Harrington neared 80-miles-per-hour on Toledano Street – more than double the 35-mile-per-hour speed limit.

11. Officers William Hery and Colby Stewart exceeded 50-miles-per-hour during the

pursuit.

12. The officers knew what they were doing was wrong, so they disabled their in-car cameras (ICC) and the only officer who activated his body-worn camera (BWC), Officer Broom, switched it off almost immediately, in an apparent admission by all involved officers that they knew the pursuit was in violation of NOPD policy.

13. As a result of their decision to engage in a vehicle pursuit, Officers Mikkelsen, Broom, Herrington, and Florian were fired, and Officers Stewart and Hery were suspended.

14. Plaintiffs Latoya Carney and Byron Wilson, Sr. are the surviving parents of victim B.W., and now bring this action asserting a deprivation of their civil rights under 42 U.S. Code § 1983 and various state law claims.

## II.   JURISDICTION AND VENUE

15. Plaintiffs' claims arise under the Constitution and the law of the United States. This Court has original jurisdiction over Plaintiffs' claims of federal rights violations pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), including excessive force and failure to intervene. This Court has supplemental jurisdiction over Plaintiffs' Louisiana state law claims in accordance with 28 U.S.C. § 1367, including intentional and negligent state torts as well as wrongful death claims.

16. The venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in Orleans Parish, Louisiana, situated in the Eastern District of Louisiana.

## III.   PARTIES

*Plaintiffs*

17. Plaintiff **Latoya Carney** is the mother of decedent B.W. and is of suitable age and capacity to file this suit. At all relevant times during this suit, she was a resident of Orleans Parish in the Eastern District of Louisiana. She is a proper plaintiff for survival and wrongful death actions, as the deceased did not have a spouse or children.

18. Plaintiff **Byron Wilson, Sr.** is the father of decedent B.W. and is of suitable age and capacity to file this suit. At all relevant times during this suit, he was a resident of Orleans Parish in the Eastern District of Louisiana. He is a proper plaintiff for survival and wrongful death actions, as the deceased did not have a spouse or children.

*Defendants*

19. Defendant **Shaun Ferguson** is an adult resident of the Eastern District of Louisiana and the Superintendent of the New Orleans Police Department. Defendant Ferguson is responsible for the supervision, administration, policies, practices, procedures, and customs of

the NOPD. He is responsible for the hiring, training, discipline, and control of the NOPD staff, supervisors, and deputies. He is sued in his individual and official capacities.

20. Defendant **Stephen Nguyen** was a sergeant of the NOPD who was the in charge of the relevant task force at the time of the vehicle chase that resulted in the deaths of B.W. and two other individuals. He is sued in his individual and official capacities.

21. Defendant **Alex Mikkelsen** was an officer of the NOPD who engaged in the vehicle chase that resulted in the deaths of B.W. and two other individuals. He is sued in his individual and official capacities.

22. Defendant **Jonathan Broom** was an officer of the NOPD who engaged in the vehicle chase that resulted in the deaths of B.W. and two other individuals. He is sued in his individual and official capacities.

23. Defendant **Jeffrey Harrington** was an officer of the NOPD who engaged in the vehicle chase that resulted in the deaths of B.W. and two other individuals. He is sued in his individual and official capacities.

24. Defendant **Alex Florian** was an officer of the NOPD who engaged in the vehicle chase that resulted in the deaths of B.W. and two other individuals. He is sued in his individual and official capacities.

25. Defendant **William Hery** is an officer of the NOPD who engaged in the vehicle chase that resulted in the deaths of B.W. and two other individuals. He is sued in his individual and official capacities.

26. Defendant **Colby Stewart** is an officer of the NOPD who engaged in the vehicle chase that resulted in the deaths of B.W. and two other individuals. He is sued in his individual and official capacities.

27. Mikkelsen, Broom, Harrington, Florian, Hery, and Stewart are collectively defined as the "Officer-Defendants."

28. Defendant **City of New Orleans** is a political subdivision of the State of Louisiana, located within the Eastern District of Louisiana. It operates the New Orleans Police Department, a law enforcement agency operating in the Eastern District of Louisiana which employed and controlled the Officer-Defendants in this case and was responsible for the hiring, training, and discipline of the officers. The City of New Orleans, through the NOPD, also created, instituted, and oversaw enforcing the policies and procedures at issue in this case.

29. Defendants **ABC Insurance Companies** are not-yet-identified insurance companies that hold policies that cover any or all of the co-Defendants for their actions alleged

herein.

30. Defendant **Doe District Commander** was the NOPD District Commander overseeing the Officer-Defendants at the time of the pursuit and crash.

31. Defendants **Does 1-10** are persons presently unknown to Plaintiffs after diligent search and inquiry.

32. Defendants Ferguson, Nguyen, Doe District Commander, and Does 1-10 collectively are "Supervisor-Defendants."

### IV.   STATEMENT OF FACTS

A.   <u>Brief background of the inherent danger of police vehicle pursuits and their impact on New Orleans.</u>

33. Vehicle chases are widely considered to be one of the most dangerous activities in which police can engage.[1]

34. The National Highway Traffic Safety Administration (NHTSA) found that "[p]olice vehicle pursuits resulted in more than 6,000 fatal crashes" and more than 7,000 deaths from 1996 to 2015.[2] Nearly a third of those victims were bystanders or occupants of vehicles not involved in the pursuit.[3]

35. Studies show that those numbers, though concerningly high in their own right, underestimate the true number of pursuit-related deaths. That is because the NHTSA relies on local police reports which often leave out whether a fatality resulted from a police chase.[4]

36. The Greater New Orleans area is no stranger to fatal police pursuits, both by the NOPD and other law enforcement agencies. According to a 2017 article in the Times-Picayune, 43 percent of Louisiana State Police chases in New Orleans involved a vehicle crash.[5]

37. Of the 20 arrests made by Louisiana State Police in New Orleans following a chase, "[o]nly one of the fleeing suspects was booked with a violent offense other than aggravated flight."[6] The Jefferson Parish Sheriff's Office has also pursued vehicles within the geographic limits of the NOPD's jurisdiction, one such chase has already resulted in a fatality in 2020.[7]

---

[1] Thomas Frank, *Fatalities from police chases climbing, could be higher than records indicate*, MCCLATCHY DC, Feb. 21, 2019, 12:00 AM, https://www.mcclatchydc.com/news/investigations/article226512455.html.
[2] Brian A. Reaves, Ph.S., *Special Report: Police Vehicle Pursuits, 2012-2013*, U.S. Depart. of Justice, Bureau of Justice Statistics, May 2017, at 6, https://www.bjs.gov/content/pub/pdf/pvp1213.pdf.
[3] *Id*.
[4] Thomas Frank, *Fatalities from police chases climbing, could be higher than records indicate*, MCCLATCHY DC, Feb. 21, 2019, 12:00 AM, https://www.mcclatchydc.com/news/investigations/article226512455.html.
[5] Emily Lane, *When should troopers chase suspects? 20 of 47 local State Police chases ended in crashes*, TIMES-PICAYUNE, Oct. 31, 2017.
[6] *Id.*
[7] Michelle Hunter and Ramon Antonio Vargas, *18-year-old dead, 2 teens hospitalized after crash during JPSO chase in Orleans Parish*, Jan. 6, 2020, https://www.nola.com/news/crime_police/article_e7ab8cd0-30de-11ea-8601-0f7a93f04926.html.

4

38. The NOPD's own history of vehicle chases and resulting crashes was implicated in the City's 2012 Consent Decree with the U.S. Department of Justice, which included the following passage prohibiting vehicle pursuits except in exceptional, specified circumstances:

> **C. Vehicle Pursuits**
> 30. NOPD agrees to prohibit vehicle pursuits, except where an officer obtains express supervisory approval, and the officer and supervisor have considered multiple factors and determined that the immediate danger to the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large. NOPD agrees to strictly prohibit the creation of roadblocks (i.e., completely blocking the roadway with vehicles or any obstructions, with the exception of approved devices designed to demobilize the pursued vehicle's movement) during a vehicle pursuit, intentionally positioning oneself in the path of the pursued vehicle, boxing in a violator with moving vehicles, and ramming a violator.
> 31. NOPD agrees to track and analyze vehicle pursuit, including the violation that prompted the pursuit; the officer(s) involved in the pursuit; the supervisor approving the pursuit; the outcome of the pursuit; any officer, suspect, or bystander injuries or deaths; property damage; and related criminal or civil legal actions. This data and analysis shall be included in the EWS and in NOPD's Use of Force Annual report.[8]

39. This Consent Decree was an enforceable judgment by a federal judge.

40. In 2015, the NOPD instituted a new policy regarding vehicle pursuits, which was developed for the purpose of "protect[ing] the safety of involved officers, the public, fleeing violators, and property."[9]

41. Per the new policy, officers were only allowed to engage in vehicle pursuits when they "have a reasonable suspicion that a fleeing suspect has committed or has attempted to commit a **crime of violence** as defined by this Chapter and the escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person" (emphasis in original).[10]

42. The policy specifies that property offenses and other non-violent infractions do not justify a pursuit.

43. The policy requires that officers must obtain supervisory approval before engaging in a pursuit.[11]

44. That policy is Chapter 41.5 of the NOPD Operations Manual.

45. Theft of a car is not a crime of violence.[12]

46. On the date of B.W.'s death, no Defendant suspected B.W. or C.C. of having

---

[8] NOPD Consent Decree, *USA v. City of New Orleans*, 12-cv-1924, USCOURTS.GOV http://www.laed.uscourts.gov/case-information/mdl-mass-class-action/nopdconsent.
[9] New Orleans Police Department Operations Manual, Chapter: 41.5, *Vehicle Pursuits*, effective Dec. 6, 2015, at 1, https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-41-5-Vehicle-Pursuits.pdf/, [hereinafter NOPD Manual].
[10] *Id*.
[11] *Id*.
[12] NOPD's policy states, "[l]ife is more important than property and protecting and preserving life must be placed above all other considerations." *Id.* at para. 5.

committed or having attempted to commit a crime of violence.

47. Officers Mikkelsen and Broom, in the leading pursuing unit, admitted the suspect vehicle was only wanted for a property offense.[13]

48. Officers Harrington and Florian, in the secondary pursuing unit, also admitted the suspect vehicle was only wanted for a property offense.[14]

49. These officers all admitted that such a vehicle pursuit was in violation of NOPD policy.[15]

50. On the date of B.W.'s death, no Defendant believed that the escape of B.W. or C.C. would pose an imminent danger of death or serious bodily injury to an officer or to another person.

51. Without sufficient training, oversight, or discipline, it was foreseeable that officers would not consistently comply with the Consent Decree or NOPD vehicle chase policy.

52. Here, the Officer-Defendants did not receive sufficient training, oversight, or discipline in order to consistently comply with the Consent Decree or NOPD vehicle chase policy.

53. As defined by NOPD policy, the interaction between the Officer-Defendants and B.W. was a vehicle pursuit.[16]

54. Officer-Defendants admitted that the incident was a pursuit according to NOPD policy.[17]

55. A member of NOPD's internal investigatory unit concluded that the Officer-Defendants "were engaging in a **pattern and practice** of purposeful violations of the pursuit policy."[18]

56. The Officer-Defendants engaged in multiple unauthorized pursuits prior to the chase that caused the death of B.W., but were not disciplined until three people died.[19]

57. Had there been better supervision over vehicle pursuits, as mandated by the federal Consent Decree as well as NOPD's own policies, B.W. and C.C.'s deaths could have been prevented.

---

[13] Dept. of Police Interoffice Correspondence to Shaun Ferguson, Superintendent of Police, from Sergeant David Barnes, Public Integrity Bureau (May 31, 2019), at 42-44 [hereinafter PIB Report].
[14] *Id.* at 46-48.
[15] *Id.* 42-48.
[16] NOPD Manual, at 1.
[17] PIB Report, at 42.
[18] *Id.* at 40 (emphasis added).
[19] *NOPD fires 4 officers, suspends 2 after fatal beauty salon pursuit crash*, WWLTV, July 17, 2019, at 6:30, https://www.youtube.com/watch?v=080Do9HjNEg&feature=emb_title.

B. The Decedent.

58. B.W. was the son of Plaintiffs Latoya Carney and Byron Wilson, Sr.

59. B.W. died at the age of 16 as a result of Officer-Defendants' decision to pursue his vehicle.

60. B.W. once dreamed of becoming a police officer himself, with a particular interest in becoming a detective.

61. Ms. Carney describes B.W. as a "sweet, quiet boy," just a normal kid who enjoyed spending time with his three siblings and his girlfriend in Palmetto.

62. B.W. graduated from William Fischer Charter School in 2017 where he played basketball and was a drummer in the marching band. He was a student at New Orleans Military & Maritime Academy (NOMMA) at the time of his death and intended to go to college following graduation.

63. B.W. spent his summers working through the City's JOB1 program, which he intended to continue in the summer of 2019 had he survived.

C. The NOPD chase resulted in the deaths of three individuals, including B.W.

64. On Wednesday, March 20, 2019, around 8:30 p.m., 16-year-old B.W. and 14-year-old C.C. were driving on Toledano Street near South Derbigny Street in the Broadmoor neighborhood of New Orleans when Defendants Alex Mikkelsen, Jonathan Broom, Jeffrey Harrington, and Alex Florian – all officers of the NOPD driving two marked squad cars – began to follow their vehicle.

65. Believing the car to be stolen, Defendants Alex Mikkelsen, Jonathan Broom, Jeffrey Harrington, and Alex Florian activated their lights and sirens, signaling to B.W. and C.C. to pull over.

66. When B.W. and C.C. accelerated, Defendants Alex Mikkelsen, Jonathan Broom, Jeffrey Harrington, and Alex Florian decided to pursue the vehicle.

67. Mikkelsen, Broom, Harrington, and Florian's two vehicles neared 80-miles-per-hour on a street marked with a 35-mile-per-hour limit.

68. Defendants William Hery and Colby Stewart followed in pursuit in a third marked squad car.

69. Officers Hery and Stewart drove in excess of 50-miles-per-hour.

70. As the pursuit began, Officer-Defendants in all three vehicles disabled their in-car cameras.

71. In-car cameras are installed in NOPD vehicles, in part, to ensure officer

compliance to appropriate constitutional requirements and NOPD policies.

72. Defendants Mikkelsen and Broom reactivated their in-car camera only at the end of the pursuit.

73. At the time of the incident, NOPD policy required activation of body-worn cameras during all vehicle pursuits.[20]

74. None of the Officer-Defendants, except Defendant Broom, activated their body-worn cameras at any point during the pursuit.

75. Defendant Broom turned his body-worn camera off almost immediately after turning it on.

76. Officer-Defendants' police lights were activated throughout the pursuit.

77. None of the Defendants had notified dispatch or any supervisor that they had located an allegedly stolen vehicle or were engaged in a pursuit, as required by NOPD policy.

78. B.W. and C.C., while being pursued by Defendants for approximately one mile, lost control of their vehicle and crashed into a beauty salon near the intersection of Washington Street and South White Street.

79. Within seconds of impact, B.W. and C.C.'s vehicle was engulfed in flames, causing the building itself to catch fire.

80. It was not until after the crash that Officer-Defendants, except for Broom, activated their body-worn cameras.

81. As the two-story building burned, officers, firefighters, and civilian onlookers helped evacuate eight individuals who were inside at the time of the crash.

82. The fire spread too quickly to save 54-year-old Schwann Hebert, who was transported to a hospital and later died as a result of injuries sustained on scene. Ms. Hebert was a patron of Unity 1 Beauty Supply and Hair Salon getting her hair done at the time of the vehicle pursuit.

83. The individuals who survived the fire suffered serious injuries as well.

84. Officer-Defendants did not suspect the occupants of the pursued vehicle of committing a crime of violence.

85. Officer-Defendants did not suspect that the occupants of the pursued vehicle were an imminent threat to themselves or to others.[21]

---

[20] NOPD Manual, Ch. 41.3.10 § 10.
[21] NOPD policy clarifies that "[d]angerous driving during a pursuit does not justify a continued pursuit." NOPD Manual, Ch. 41.5 at 4.

86. Randon Montgomey, a witness to the vehicle chase, discussed Defendants' actions with reporters on scene, stating "I didn't see them fall back … or wave off a pursuit. Lives were lost, and a cornerstone of the community was destroyed."[22]

87. According to Chief Ferguson, "three lives were lost as a result of a violation of policy, poor decision that was made and not just that poor decision that was made that night."[23]

88. B.W.'s life was lost as a result of a violation of NOPD policy.

89. B.W.'s life was lost as a result of the decisions of Officer-Defendants.

90. The Defendant-Officers' vehicle pursuit caused the death of B.W.

D. Investigation and response.

91. Sergeant David A. Barnes, assigned to the NOPD's Public Integrity Bureau Force Investigation Team, investigated the police chase.

92. Sgt. Barnes ultimately found the Defendant-Officers at fault for initiating and engaging in the vehicle pursuit in violation of NOPD policies.

93. Defendant-Officers violated NOPD policy in pursuing B.W. and C.C.

94. As a result of the investigation, four of the Defendants – Officers Mikkelsen, Broom, Herrington, and Florian – were terminated from the NOPD.

95. Defendants Colby Stewart and William Hery received suspensions of 44 and 54 days, respectively, though they were later reduced.

96. When Defendant Shaun Ferguson announced the terminations and suspensions, he "said the 6th District task force officers had also been involved in three unauthorized police chases in the weeks leading up to the deadly incident on Washington Avenue"[24] though the officers were, apparently, not punished for those pursuits or received any additional training which could have prevented further pursuits.

97. Some or all of the Officer-Defendants had been involved in three unauthorized police chases in the weeks leading up to B.W.'s death.

98. Sergeant Barnes discovered Officers Mikkelsen, Broom, Florian, Hery, and Stewart had been involved in previous unauthorized pursuits prior to the pursuit that resulted in B.W.'s death.

---

[22] Ramon Antonio Vargas, *3 lives and a Broadmoor business destroyed after fiery New Orleans crash*, NEW ORLEANS ADVOCATE, Mar. 21, 2019, https://www.nola.com/news/crime_police/article_e78cc1007-5219-ae0a-c762b9fd2c8b.html.

[23] Katherine Mozzone, *NOPD: 4 officers fired over chase that sparked deadly, fiery crash at Broadmoor salon*, FOX8-WVUE, July 17, 2019, https://www.fox8live.com/2019/07/17/source-nopd-officers-fired-over-chase-that-sparked-deadly-fiery-salon-crash-march/ (emphasis added).

[24] Matt Sledge, *4 NOPD officers fired, two others suspended for chase ending in fatal Broadmoor crash, blaze*, NEW ORLEANS ADVOCATE, July 17, 2019, https://www.nola.com/news/crime_police/article_7c772c10-a8d2-11e9-92e3-8fa20af7cab9.html (emphasis added).

99. Sergeant Barnes also uncovered videos of those pursuits showing that the officers had turned off their in-car cameras and either deactivated or failed to activate their body-worn cameras.[25]

100. Sergeant Barnes concluded that the Defendant-Officers, with the exceptions of Harrington and Stewart, "purposefully ensured the in-car cameras in their vehicles was deactivated so as not to capture the events of the incident."[26]

101. Sergeant Barnes also concluded that all of the Defendant-Officers failed to ensure their body-worn cameras were activated during the incident, as required by NOPD policy.

102. Finding "purposeful violations of the body worn camera policy, in-car camera policy, and the pursuit policy, and those purposeful violations led to the deaths of three individuals," Sergeant Barnes determined the incident was an egregious offense according to NOPD Chapter 26.2.1 because of the gravity and the excess of aggravating circumstances.[27]

103. An egregious offense is "an intentional offense that causes injury to a member of the public or results in a violation of another person's civil rights."[28]

104. Sergeant Barnes also interviewed Sergeant Stephen Nguyen, who was in charge of the task force, and noted "Sergeant Nguyen did not possess the qualifications to provide strong, close, and effective supervision to a proactive unit."[29]

105. Sergeant Nguyen explained that "the in-car camera footage was questionable, but he didn't question his officers as to why they turned off the MVU and assumed they were disengaging from the vehicle."[30]

106. According to Sergeant Barnes, Sergeant Nguyen seemed to condone the officers turning off their body-worn cameras prior to the end of the incident.[31]

107. Commander Ronnie Stevens was also interviewed and appeared "visibly upset" when he observed video footage of a separate possible pursuit violation.

108. Commander Stevens explained "that his instructions for Sergeant Nguyen when he took over the task force was to provide close and effective supervision by being involved with his officers."[32]

109. Sgt. Nguyen did not provide close and effective supervision over Officer-

---

[25] PIB Report, at 29, 34-36. *See also* NOPD Item Numbers B-36963-19, C-11128-19, and C-17963-19.
[26] *Id.* at 39.
[27] *Id.* at 40.
[28] NOPD Manual, Ch. 26.2.1 (emphasis added).
[29] PIB Report, at 26.
[30] *Id.*
[31] *Id.*
[32] *Id.* at 27.

10

Defendants.

110. Sgt. Nguyen's failure to provide close and effective supervision over Officer-Defendants resulted in the death of B.W.

111. Lieutenant Samuel Palumbo, Jr., another officer who arrived on scene, "appeared genuinely surprised to learn there were other instances in which the officers had engaged in possible pursuits and deactivated their cameras during the incident."

112. He also informed Sergeant Barnes that he instructed Sergeant Nguyen when he took over the task force to "make sure he stayed 'on top' of his officers because there were several newer officers in the task force who needed supervision."[33]

113. Stella Cziment, the City's Deputy Independent Police Monitor, suggested that the deactivation of cameras constituted "apparent cover-up attempts."[34]

114. Officers' ability to manually override dashboard recordings was an issue that was identified in the 2010 U.S. Department of Justice investigation that prompted the federal Consent Decree that remains in place today.

115. Two months before B.W.'s death, the Federal Consent Decree Monitor reported in its most recent comprehensive report that NOPD was still not in compliance with the "Performance Evaluations" and "Supervision" sections of the Consent Decree.[35]

116. The Monitor specified that the quality of NOPD's supervisor evaluations are particularly concerning.[36] The report noted that there was no evidence that supervisors were incorporating knowledge gained from their review of officers' body-worn camera and in-car camera recordings.

117. Although the NOPD disciplined the Officer-Defendants, the failure of parties in supervisory roles to properly train and previously discipline the officers contributed to and caused the injuries suffered by B.W.

V. CAUSES OF ACTION

One – 42 U.S.C. § 1983, Violations of Fourth and Fourteenth Amendments

*All Plaintiffs against All Defendants*

118. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

---

[33] *Id.*
[34] Matt Sledge, *Were NOPD Officer Firings over Chase Policy Appropriate or Severe?*, THE ADVOCATE, July 18, 2019, 4:21 PM, https://www.nola.com/news/courts/article_8a6060f6-a9a1-11e9-91ed-bb0c1c050bc0.html.
[35] *Comprehensive Reassessment of the Consent Decree Monitor*, OFFICE OF CONSENT DECREE MONITOR, Jan. 24, 2019, at 48-50 [hereinafter Comprehensive Reassessment].
[36] *Id*. at 15, 48-50.

11

119. Section 1983 "provides for the recovery of damages when individuals are deprived of their constitutional rights by a person acting under color of state law." *O'Neal v. Cazes*, 257 Fed.Appx. 710, 713 (Oct. 1, 2007), 2007 WL 2875998. Public officials are entitled to immunity from civil damages for their discretionary acts if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Liability for substantive due process violations "for high-speed police pursuits is deliberate indifference to, or reckless disregard for, a person's right to life and personal security." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

120. At all times relevant to this Complaint, Defendants Mikkelsen, Broom, Harrington, Florian, Hery, and Stewart, acting in their capacities as officers of the New Orleans Police Department, were required to obey the laws of the United States, including relevant laws under the Fourth and Fourteenth Amendments of the United States Constitution.

121. The right to be free from punishment and deprivation of life and liberty without due process of law and the right to be free from illegal seizure and excessive force are clearly established and would have been known to Defendants as law enforcement officers.

122. The federal consent decree provision and New Orleans Police Department policy banning unauthorized vehicle pursuits was clearly established and known to Defendants.

123. Defendants' actions and omissions were willful, wanton, reckless, malicious, oppressive, and/or done with a conscious or reckless disregard for the constitutional rights of the deceased to a degree that shocks the conscience.

124. The United States Supreme Court has found police chases to violate the Fourth and Fourteenth Amendments protections against illegal seizure, excessive force, and lack of due process, as is alleged here, when the factual circumstances dictate and when the suspect is "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower v. County of Inyo*, 489 U.S. 593 (1989). This ruling stemmed from a series of Fourth Amendment rulings centering on liability from "intentional acquisition of physical control." *Id*. at 596; *see also Tennessee v. Garner*, 471 U.S. 1 (1985) (holding that the fatal shooting of a fleeing suspect constituted a Fourth Amendment seizure).

125. The United States Supreme Court elaborated on that jurisprudence in *County of Sacramento v. Lewis*, in which they found a vehicle pursuit to be lawful, but only because the snap-decision that officer had to make undermined a finding that the officer intended to harm the suspect and that the officer had to balance the risks of the chase with the need to enforce the law.

523 U.S. 833 (1998).

126. In the present case, Defendants had the luxury of not having to balance the risks and rewards of pursuing a stolen vehicle – NOPD's policy expressly prohibited such a decision. And the policy did so precisely *because* vehicle pursuits are an instrumentality which is likely to result in significant injury or death, as this particular pursuit did.

127. Because the Officer-Defendants made a conscious decision to engage in a pursuit of B.W. despite knowing it was in violation of NOPD policy considering the suspected crime, knowing that it was likely to result in injury or death of B.W. and/or innocent bystanders, and that their actions actually *caused* in danger in a manner that shocks the conscience, their actions constitute an illegal seizure, excessive force, and denial of due process in violation of the deceased's Fourth and Fourteenth Amendments of the United States Constitution, and by extension caused injuries to his next of kin.

### *Two – Failure to Intervene*

*All Plaintiffs against Defendants Mikkelsen, Broom, Harrington, Florian, Hery, and Stewart*

128. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

129. Bystander liability under 42 U.S.C. § 1983 applies to officers when "the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."[37]

130. During the events described herein, each Officer-Defendant was aware of – and engaged in – the pursuit of B.W., but did not intervene to prevent the violation of constitutional rights, even though he had the opportunity and duty to do so, for example by communicating with other Defendants via radio.

131. The actions of the Defendants were the direct and proximate cause of the injury to the deceased and his next of kin.

132. No Defendant intervened to stop the pursuit that led to B.W.'s death.

133. No Defendant attempted to intervene to stop the pursuit that led to B.W.'s death.

134. The misconduct described in this Count was objectively unreasonable and undertaken intentionally, with malice and knowing disregard for B.W.'s clearly established constitutional rights.

135. As a direct and proximate result of the Defendants' failure to intervene, Plaintiffs

---

[37] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (internal citations omitted); *see also Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995).

suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, and legal expense.

### *Three* – Violation of the Louisiana Constitution

*All Plaintiffs against all Defendants*

136. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

137. Defendants' actions as described herein interfered with state constitutional rights, including the right to due process and the rights to be free from unlawful seizure and excessive force.

### *Four* – State Torts of Negligence and Negligent Infliction of Emotional Distress

*All Plaintiffs against all Defendants*

138. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

139. In addition to constitutional protections, excessive force claims fall under the ambit of the general negligence provision of Louisiana Civil Code article 2315, and the standard duty/risk analysis applies to determine whether the police officer involved was negligent. *Jenkins v. Fanguy*, 946 So.2d 201, 292 (La.App. 4 Cir. 11/15/06). Under duty-risk analysis for determining liability, a plaintiff must prove (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to plaintiff; (3) the requisite duty was breached by the defendant; and (4) the risk of harm was within the scope of protection afforded by the duty breached. *Stroik v. Ponseti*, 699 So.2d 1072, 1078 (La. 1997).

140. Officer-Defendants' actions were the cause-in-fact of B.W.'s death, and the risk of causing B.W.'s death was within the scope of duty that was breached by the officers' excessive force.

141. Police officers owe the public the duty of maintaining peace and order, preventing and detecting crime, and enforcing laws. *Zeagler v. Town of Jena,* 556 So.2d 978 (La.App. 3 Cir.). The duty owed by a police officer in approaching and/or arresting a suspect is to act reasonably under the totality of the circumstances. *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318 (La. 1994).

142. Officer-Defendants breached the duty owed to B.W. by violating their own policy by pursuing a vehicle for a property offense and, by their own admissions, the pursued vehicle

did not pose a threat of serious bodily injury or death.[38]

143. Supervisor-Defendants and the City of New Orleans were vicariously liable for the negligence of the pursuing officers and independently negligent for failing to adequately train its officers and effectively supervise officers who engage in vehicle pursuits.

144. Supervisor-Defendants were negligent for the lack of supervision during the pursuit that resulted in B.W.'s death and the failure to terminate that same pursuit. Supervisor-Defendants also were also negligent by failing to take any action in response to the Officer-Defendants' previous vehicle chases.

145. Defendants' conduct was extreme and outrageous; knowing that the emotional distress suffered by Plaintiffs was severe; and Defendants desired or acted with recklessness to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

146. Defendants' decision to initiate and continue a high-speed vehicle chase against NOPD policy and the federal Consent Decree was substantially certain to result in serious bodily injury or loss of life.

147. Defendants' actions were the cause-in-fact of Plaintiffs' injuries.

### Five – *Monell* and Failure to Train and Discipline

*All Plaintiffs against all Supervisor-Defendants and City of New Orleans*

148. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

149. Liability under § 1983 for failure to train or supervise is shown when: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."[39]

150. The misconduct described above was caused by the policies, practices, and customs of Defendants, because their employees and agents regularly engage in unauthorized vehicle pursuits, despite the policy banning them. The Officer-Defendants had, according to Defendant Ferguson himself, themselves engaged in multiple unauthorized vehicle pursuits in the weeks leading up to March 20, 2019, and were, upon information and belief, not punished for

---

[38] La. R.S. 32:24(D) "shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."
[39] *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998).

those acts.[40] During one sample size reported in the Times-Picayune, NOPD officers engaged in 22 vehicle pursuits from January 1, 2017, through September 15, 2017, despite the policy having been in place since 2015.[41]

151. Without enforcement of the policy, the practice of unauthorized vehicle pursuits continued, constituting the *de facto* policy of Defendants as the policymakers with authority acted with deliberate indifference to the problem, effectively ratifying unauthorized vehicle chases.

152. Furthermore, the practice of engaging in unauthorized vehicle chases was allowed to flourish despite the written policy because Defendants declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents. Even if there was some response to pursuit policy violations, it clearly was insufficient considering the repetitive misconduct particularly by the same officers.

153. NOPD Policy Chapter 41.3.8 § 35 requires that:

> Supervisors shall review all In-Car Camera recordings of officers listed on any report involving injuries to detainees/prisoners or officers; uses of force; vehicle pursuits; or misconduct complaints, as well as any recordings related to an event the officer believes may result in a misconduct complaint. The supervisor shall conduct any further investigation that he/she deems appropriate.

154. The Officer-Defendants' supervisors did not review the In-Car Camera recordings of the pursuits prior to the one resulting in B.W.'s death.

155. The Officer-Defendants' supervisors did not investigate the pursuits prior to the one resulting in B.W.'s death.

156. Sergeant Nguyen was instructed at least twice by NOPD supervisors to provide close and effective supervision over his officers when he took over the task force. Yet, Sergeant Barnes still concluded that Sergeant Nguyen did not exercise supervision appropriate to the position that he held, notwithstanding the numerous videos that were discovered that showed the officers' violations of pursuit policy, body-worn camera policy, and in-car camera policy.

157. Supervisor-Defendants and the City of New Orleans were both aware of the issues of poor supervision and officer evaluations, which allowed multiple unauthorized vehicle pursuits to occur, and failed to take appropriate action to stop the misconduct. This is particularly true considering the latest Consent Decree Monitor report that was issued only two months prior

---

[40] *NOPD fires 4 officers, suspends 2 after fatal beauty salon pursuit crash*, WWLTV, July 17, 2019, at 6:30, https://www.youtube.com/watch?v=080Do9HjNEg&feature=emb_title.
[41] Emily Lane, *When should troopers chase suspects? 20 of 47 local State Police chases ended in crashes*, TIMES-PICAYUNE, Oct. 31, 2017.

to B.W.'s death.

158. The failure to properly train and discipline officers was directly linked to B.W.'s death. Had there been more adequate supervision, proper training, and discipline of misconduct, unauthorized pursuits would have been discovered and B.W.'s death would have been prevented.

159. The failure to train and discipline by Supervisor-Defendants as well as City of New Orleans, after being put on notice of the extent of the issues by the Consent Decree Monitor report published two months before, can only demonstrate a deliberate indifference to B.W.'s and the Plaintiff's constitutional rights.

### Six – Vicarious Liability

*All Plaintiffs against all Supervisor-Defendants and City of New Orleans*

160. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

161. All Supervisor-Defendants and the City of New Orleans are liable to Plaintiffs for the constitutional violations as well as the negligent and intentional acts and omissions of those under their direction and control pursuant to Louisiana Civil Code article 2320 and the doctrine of *respondeat superior*.

### Seven – Indemnity

*All Plaintiffs against the City of New Orleans*

162. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

163. Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

164. The City of New Orleans operates the New Orleans Police Department, a law enforcement agency which employed and controlled the Officer-Defendants in this case, and was responsible for the hiring, training, and discipline of the officers.

165. While committing the misconduct alleged herein, some Defendants were employees, members, and agents of the City of New Orleans within the scope of their employment.

166. The City of New Orleans is therefore obligated by Louisiana statute to pay any judgment entered against their employees, Officer-Defendants and Supervisor-Defendants.

### *Eight* – State Law Direct Action Claim
*All Plaintiffs against ABC Insurance Companies*

167. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

168. Defendant ABC Insurance Companies, upon information and belief, have issued and/or currently have in effect one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated Defendant Insurance Companies, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiffs or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiffs.

169. By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiffs for all damages and injuries Plaintiffs have suffered as a result. Upon information and belief, Defendant Insurance Companies are contractually obligated to pay these sums on behalf of the insured Defendant(s).

170. Upon information and belief, Defendant Insurance Companies are liable to Plaintiffs for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

171. Under Louisiana Revised Statute § 22:655(B), Plaintiffs bring a direct action against Defendant Insurance Companies to recover any and all sums they are obligated to pay Plaintiffs on behalf of their insureds or to indemnify their insureds.

### *Nine* – Wrongful Death and Survival Action
*All Plaintiffs against All Defendants*

172. Plaintiffs incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

173. The deceased, B.W., was never married and did not father any children.

174. Plaintiffs, Latoya Carney and Byron Wilson, Sr., are the surviving father and mother of the deceased, B.W., and therefore are the proper plaintiffs under La. Civ. Code arts. 2315.1 (survival actions) and 2315.2 (wrongful death actions).

175. For the reasons stated above, Defendants wrongfully caused the death of Plaintiffs' son, B.W.

176. As a direct and proximate result of Defendants' actions, B.W. suffered injuries,

including death.

177. Plaintiffs suffered both economic and non-economic damages for the wrongful death and the last surviving moments of B.W., including but not limited to funeral expenses, pain and suffering, and loss of consortium.

### VI. RELIEF REQUESTED

178. Wherefore Plaintiffs request judgment be entered against Defendants and that the Court grant the following:

    a. Declaratory relief;

    b. Judgment against Defendants for Plaintiffs' asserted causes of action;

    c. Award of compensatory damages;

    d. Award of special damages;

    e. Award costs and attorney's fees pursuant to 42 U.S.C. § 1988;

    f. Order such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

179. Plaintiffs state any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other damages or remedies which this Court may seem equitable.

180. Plaintiffs reserve the right to notice of defect to this pleading and reserve the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

Respectfully submitted,

Latoya Carney and Byron Wilson, Sr., by and through their counsel,

/s/ William Most
WILLIAM MOST, La. Bar. No. 36914
David Lanser, La. Bar No. 37764
201 St. Charles Ave., Ste. 114, #101
New Orleans, LA 70170
(504) 509-5053
williammost@gmail.com

/s/ Allyson Billeaud
ALLYSON BILLEAUD, La. Bar. No. 37427
P.O. Box 24233
New Orleans, LA 70184
(504) 315-5494
allybilleaud@gmail.com