**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| LATOYA CARNEY, et al, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| CITY OF NEW ORLEANS, et al | )  Case No. 2:20-cv-00901-LMA-DMD |
| | ) |
| Defendants. | ) |

**OPPOSITION TO MOTION TO DISMISS**

NOW INTO COURT, through undersigned counsel, come Plaintiffs Latoya Carney and Byron Wilson, Sr., representing the minor, B.W., who submit this opposition to the Motion to Dismiss[1] filed by Defendants City of New Orleans, Shaun Ferguson, and Stephen Nguyen (collectively, "Supervisory Defendants").

## I.   INTRODUCTION

On March 20, 2019, a group of New Orleans Police Department ("NOPD") officers pursued a vehicle containing two teenage boys, believing the vehicle he was in to be stolen. The officers drove at speeds of almost 80 mph in a 35-mph zone. That pursuit ended when the boys' vehicle crashed into a beauty salon, killing both teenagers and a salon patron.

This pursuit should have never happened. NOPD officers are banned from engaging in pursuits under these circumstances by the order of this Court via a federal consent decree. The officers knew their conduct was wrongful, as indicated by the fact that they disabled their in-car cameras and body-worn cameras during the chase.

It was also not these officer's first time. An internal NOPD investigation shows that the officers who pursued B.W. had engaged in a pattern of multiple unauthorized vehicle pursuits

---

[1] R. Doc. 17.

1

prior to the crash. Plaintiffs' complaint alleges – and the pattern corroborates – that B.W.'s death was caused in part by Supervisory Defendants' failure to provide proper training, monitor their officers' actions, and discipline their officers for past violations. Indeed, the Supervisory Defendants – including the officers' direct supervisor, Defendant Nguyen – took absolutely no steps to discipline *any* of the officers until three people were dead.

Supervisory Defendants move to dismiss, arguing in part that Plaintiff's complaint does not sufficiently allege a pattern of officer misconduct that led to B.J.'s death. But as the Complaint alleges, Chief Ferguson has already publicly conceded that it was not just the events of that one night that caused B.J.'s death. In July 2019, he stated that "three lives were lost as a result of a violation of policy, poor decision that was made and **not just that poor decision that was made that night**."[2] And NOPD's own internal investigation found that Defendant Stephen Nguyen lacked the qualifications to supervise the officer-defendants and that he condoned their behavior in turning off their cameras.[3]

Because Plaintiffs have sufficiently pleaded liability against Supervisory Defendants in their Complaint, the Motion to Dismiss should be denied.

## II.     FACTUAL BACKGROUND

Police-involved vehicle pursuits are inherently dangerous, and New Orleans is no exception.[4] In 2012, the NOPD was ordered, via a Consent Decree, to prohibit vehicle pursuits except in very specific circumstances and then only with supervisory approval.[5] The NOPD codified those requirements into their own policy in 2015, which noted that officers could only engage in a vehicle pursuit in instances where there is a "reasonable suspicion that a fleeing

---

[2] R. Doc. 8 ("Amended Complaint") at ¶ 87.
[3] *Id.* at ¶¶ 104-106.
[4] *Id.* 8 at ¶¶ 33-38.
[5] *Id.* 8 at ¶ 38.

suspect has committed or has attempted to commit a **crime of violence** as defined by this Chapter and the escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person" (emphasis in original).[6] Theft of a vehicle is not a crime of violence, and thus a suspected stolen vehicle is not a justification for engaging in a pursuit.[7]

Around 8:30 p.m. on March 20, 2019, 16-year-old B.W. and another minor were driving through the Broadmoor area, not exceeding the speed limit or committing any other traffic violations.[8] Defendants Alex Mikkelsen, Jonathan Broom, Jeffrey Harrington, and Alex Florian ("officer-defendants") followed B.W.'s vehicle, believing it to be stolen.[9] The officers activated their lights and sirens, causing B.W.'s vehicle to accelerate.[10] Although they had already assessed the situation and determined the alleged crime was a stolen vehicle – not a crime of violence – the officers decided to pursue the vehicle, reaching 80-miles-per-hour in a 35-mile-per-hour zone.[11] After deciding to initiate pursuit, the officer-defendants disabled their in-car cameras and failed to turn on their body-worn cameras –in violation of both policy and the Consent Decree – with the exception of Defendant Broom, who briefly activated his body-worn camera before turning it back off almost immediately.[12] The pursuit ended tragically, as B.W.'s vehicle crashed into a beauty salon near the intersection of Washington Street and South White Street, causing a building fire and ultimately killing B.W., the other occupant, and a salon patron.[13]

---

[6] *Id.* at ¶ 40-41.
[7] *Id.* at ¶ 45.
[8] R. Doc. 8 at ¶ 64.
[9] *Id.* at ¶ 64.
[10] *Id.* at ¶ 65.
[11] *Id.* at ¶ 66-67.
[12] *Id.* at ¶ 70-75.
[13] *Id.* at ¶ 78.

NOPD's Public Integrity Bureau investigated the matter and determined that the officer-defendants were at fault for initiating the pursuit.[14] The investigation also found that Defendant Stephen Nguyen lacked the qualifications to supervise the officer-defendants and that he condoned their behavior in turning off their cameras.[15] Defendant Shaun Ferguson apparently agreed that the problems were systemic as he, in an address to the media in July 2019, stated that "three lives were lost as a result of a violation of policy, poor decision that was made and not just that poor decision that was made that night."[16] As a result, some officer-defendants were suspended and others were terminated.[17]

### III. LEGAL STANDARD

A. <u>Standard for Dismissal under Rule 12(b)(6).</u>

Dismissal under Rule 12(b)(6) is disfavored and rarely granted.[18] While assessing a Rule 12(b)(6) motion to dismiss, a court must view all well-pleaded facts in the light most favorable to the plaintiff.[19] Rule 12(b)(6) analysis is generally limited to the complaint and its attachments, which "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[20] Even if a plaintiff's complaint is found deficient under Rule 12(b)(6), the proper remedy is usually to allow the plaintiff to amend the complaint to cure any deficiencies, rather than dismissal with prejudice.[21]

B. <u>Standard for qualified immunity.</u>

---

[14] R. Doc. 8 at ¶ 92.
[15] *Id.* at ¶ 104-06.
[16] *Id.* at ¶ 87.
[17] *Id.* at ¶ 94-95.
[18] *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).
[19] *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (en banc).
[20] *Id.*, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[21] *Public Health Equip. & Supply Co. v. Clarke Mosquito Control Equip., Inc.*, 410 Fed. Appx. 738, 740 (5th Cir. 2010) (finding that district court erred in denying plaintiff's motion to amend complaint after dismissal under Rule 12(b)(6)).

Officials acting within their scope of their employment may be immune from liability, but only in circumstances where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[22] Once qualified immunity is invoked, as it has been here, a plaintiff must allege facts that, if true, show that the defendant violated a statutory or constitutional right afforded to the plaintiff and that the right was "clearly established" at the time the violation occurred.[23] Like the Rule 12(b)(6) standard, a court must analyze the qualified immunity standard through the "the light most favorable to the party asserting the injury," which, as here, is typically the plaintiff.[24] The inquiry must also be viewed in the specific context of the case.[25] It is not necessary for a case to be directly on point for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate."[26]

### IV.   DISCUSSION

Plaintiffs' Complaint contains sufficient allegations to state plausible causes of action and no Supervisory Defendants are entitled to qualified immunity. Therefore, the Motion to Dismiss must be denied.

   A. <u>Plaintiffs have sufficiently plead and supported Fourth and Fourteenth Amendment violations.</u>

Supervisory Defendants argue whether Plaintiffs have sufficiently plead Fourth and Fourteenth Amendment violations. First, Defendants argue that vehicle pursuits that end in crashes do not constitute a "seizure" under the Fourth Amendment because there was not "a

---

[22] *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
[23] *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002).
[24] *Saucier v Katz*, 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).
[25] *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).
[26] *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

governmental termination of freedom of movement."[27] Second, Defendants also argue that the officers' behavior did not shock the conscience, as required for a Fourteenth Amendment violation.[28] Neither of these arguments are supported by the caselaw.

The Fourth Amendment to the Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." It is well settled that an individual stopped by police – whether by physical apprehension, a fatal shooting, or other methods – is "seized" for the purposes of Fourth Amendment liability.[29] In *Brower v. County of Inyo*, the Supreme Court of the United States has set the standard for vehicle chases that it is "enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result."[30]

Defendants offer a handful of cases, including *Brower*, in which the Court ultimately sided with the defendants in finding no liability.[31] But Defendants misstate the precedent as holding that vehicle chases *must* involve physical contact in order for a plaintiff to be considered "stopped by the very instrumentality set in motion or put in place in order to achieve that result."[32] The cited cases do not say that a non-contact vehicle chase is *never* considered a Fourth Amendment violation and, in fact, state that a "show of authority" without physical interaction

---

[27] R. Doc. 17-1 at 10.
[28] *Id.* at 12.
[29] See, e.g., *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).
[30] *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).
[31] R. Doc. 17-1 at 9-10.
[32] *Brower,* 489 U.S. at 597-98 (discussing hypothetical scenario where an officer "had shouted, 'Stop and give us those bottles, in the name of the law!' and the defendant and his accomplice had complied. Then the taking of possession would have been not merely the result of government action but the result of the very means (the show of authority) that the government selected, and a Fourth Amendment seizure would have occurred.").

can, under certain circumstances, be enough to constitute a seizure.[33] This is one of those circumstances.

In each of the cases cited by Defendants, the "show of authority" and the pursuit itself were proper and, therefore, a reasonable step in the chain of events leading to the crash.[34] In contrast, the officers' actions in the present case were not reasonable, as a pursuit of a vehicle in these circumstances is specifically banned by this Court's order and NOPD policy.[35] This was not a "snap decision" made by the officers in the interest of public safety, as in the cases Defendants rely on.[36] The officers sought to seize B.W. when they initiated the show of authority.[37] They further sought to seize B.W. when they initiated the pursuit and continued to pursue B.W. for several blocks.[38] They made the deliberate choice to turn off their cameras and not obtain supervisory approval.[39] That these unreasonable actions were so inherently contrary to policy, so deliberate, and, as explained in the Complaint, so likely to result in a crash, the pursuit can be considered a means intentionally applied and a violation of the Fourth Amendment.

Further, Supervisory Defendants can hardly argue that a vehicle pursuit is not a seizure when their own Operations Manual considers "[a]ny vehicle pursuit resulting in death, serious physical injury, or injuries requiring hospitalization" to be a Level-4 use of force, the most serious designation of force in the Manual, whether or not actual physical force was applied.[40]

The complaint also alleges that Defendants violated the Fourteenth Amendment, which prohibits the deprivation of "life, liberty, or property without due process of law."[41] A due

---

[33] *Galas v. McKee*, 801 F.2d 200, 203 (6th Cir. 1986).
[34] R. Doc. 17-1 at 9-10.
[35] R. Doc. 8 at ¶¶ 38-41.
[36] R. Doc. 17-1 at 9-10.
[37] R. Doc. 8 at ¶ 65.
[38] *Id.* at ¶ 66.
[39] *Id.* at ¶¶ 70-74.
[40] New Orleans Police Department Operations Manual, Ch. 1.3.2 at 4.
[41] U.S. Const. Amend. XIV § 1.

process portion of the Fourteenth Amendment "is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'"[42] Defendants attempt to draw a comparison between the facts herein and those in *County of Sacramento v. Lewis*[43] to claim that, although the City of Sacramento had similar general orders regarding vehicle pursuits, the officers' behavior was not conscience-shocking because it was an instantaneous response that had to be balanced against an officer's duty "to restore and maintain lawful order."[44] But in *Lewis*, the officers were responding to an unrelated call when they "saw a motorcycle approaching at high speed" and had to make a snap decision how and whether to react to the dangerous behavior which the motorcycle driver initiated prior to the police involvement.[45] That is wholly distinct from the present facts in which the speeding vehicle was *induced by* Defendants' behavior.[46] Unlike in *Lewis*, Defendants here did have the benefit of weighing the pros and cons of initiating the pursuit and made a conscious decision to do so, regardless.[47] Defendants were not faced with a split-second decision involving a speeding car – they chose to create a situation from nothing which violated NOPD policy and the Court order.[48] If they had not made that decision, three people would still be alive today.

Defendants also argue that merely violating policy or a consent decree does not rise to the level of being conscience-shocking.[49] But it was not simply the violation of a policy or decree that is at issue – the officers not only committed a conscience-shocking act on the night B.W.

---

[42] *County of Sacramento v. Lewis, 118 S.Ct. 1708, 523 U.S. 833, 140 L.Ed.2d 1043 (1998)* (*quoting Collins v. Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).
[43] 118 S.Ct. 1708, 523 U.S. 833, 140 L.Ed.2d 1043 (1998).
[44] R. Doc. 17-1 at 11.
[45] *County of Sacramento v. Lewis*, 118 S.Ct. 1708, 523 U.S. 833, 140 L.Ed.2d 1043 (1998)
[46] R. Doc. 8 at ¶¶ 65-66.
[47] *Id.*
[48] *Id.*
[49] R. Doc. 17-1 at 10.

was killed, but had engaged in similar pursuits in the weeks leading up to March 20, 2019.[50] Taking the facts in the light most favorable to plaintiff, we have: a group of officers who engaged in a series of high-speed chases forbidden by NOPD policy and Court order.[51] That pattern culminated in the officers chasing two under-age children who were on a joyride, at speeds of almost 80 miles-per-hour in a 35 miles-per-hour zone.[52] The officers knew their conduct was wrongful, as indicated by the fact that they disabled their in-car cameras and body-worn cameras.[53] Their decision to engage in the pursuit resulted in the deaths of three people.[54] And the Supervisory Defendants – including the officers' direct supervisor, Defendant Nguyen – took absolutely no steps to discipline *any* of the officers until three people were dead.[55] And the NOPD's own investigation found not only that Defendant Nguyen failed to stop this and the subsequent pursuits, but also that he lacked the basic qualifications of a supervisor and actually condoned the officer-defendants' decision to turn off their cameras to hide their tracks.[56] That is a fact-pattern that a reasonable jury could find to be conscience-shocking. The Motion to Dismiss should be denied.

B. <u>Defendants Ferguson and Nguyen are not entitled to qualified immunity.</u>

Government officials are immune from liability only in circumstances where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[57] Defendants Ferguson and Nguyen have asserted qualified immunity here, claiming that they are immune from suit because they did not have an

---

[50] R. Doc. 8 at ¶¶ 96-97.
[51] *Id.* at ¶¶ 38-41.
[52] *Id.* at ¶¶ 64-67.
[53] *Id.* at ¶¶ 70-75.
[54] *Id.* at ¶¶ 78-82.
[55] *Id.* at ¶¶ 104-06.
[56] R. Doc. 8 at ¶¶ 104-06.
[57] *Pearson v. Callahan*, 555 U.S. 223, 231; 129 S.Ct. 808, 815; 172 L.Ed.2d 565 (2009).

active role in the constitutional violations or were deliberately indifferent to the consequences of their actions or inactions.[58]

Defendants argue that they are entitled to immunity because the "NOPD vehicle policy is explicit" and the officers who violated the policy were disciplined. But this ignores the central thrust of Plaintiffs' individual liability claims against Defendants Ferguson and Nugyen: that B.W. would not have died if the training was sufficient and/or if the officers had been reprimanded for the multiple illegal vehicle pursuits in they engaged during the weeks preceding March 20, 2019. Defendants cannot simply create a policy and expect it to shield them from liability because the policy exists – it must be implemented and enforced in a manner in which the policy functions as designed.[59] Plaintiffs are not attacking the policy itself, but rather the actions of Defendants Ferguson and Nguyen in relation to that policy's adoption and implementation. The Complaint alleges that it was these defendants' failure to train and supervise their subordinates that led to the prohibited vehicle pursuit at issue,[60] an allegation that is made plausible by the fact that it happened repeatedly in the time period leading up to B.W.'s death.[61] It is even more plausible because the NOPD's own investigation found Defendant Nguyen "did not possess the qualifications to provide strong, close, and effective supervision to a proactive unit" and even "seemed to condone" the officer-defendants' behavior.[62] And Defendants failed to address these issues, despite a Consent Decree Monitor report a few months

---

[58] R. Doc. 17-1 at 13-14.
[59] See, e.g, *Caballero v. Caplinger*, 914 F.Supp. 1374 (E.D. La. 1996) ("If a government action meets substantive due process standards, it can still be rejected as violative of procedural due process if it is not implemented in a fair manner.").
[60] R. Doc. 8 at ¶¶ 104-106.
[61] *Id.* at ¶¶ 96-97.
[62] *Id.* at ¶¶ 104-106.

prior to the crash noting the serious deficiencies.[63] At the motion to dismiss stage, nothing more is needed.

    C. <u>Defendant Shaun Ferguson is liable in his official capacity under *Monell*.</u>

While *respondeat superior* does not apply to municipalities in a § 1983 suit, a local government may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[64] Pursuant to that theory, a municipality may be liable if there is found to be a policy or widespread custom that led to the constitutional violation, or if the municipality failed to supervise its employees, leading to the constitutional violation.

        1. Defendants' failure to supervise its employees amounted to a policy and custom which directly caused B.W.'s death.

Under the policy or custom theory of liability, a municipality may be found liable if there is "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority"[65] or if there was a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[66] Defendants argue that Plaintiffs "cannot establish" that there was a failure to train or discipline,[67] but at the Motion to Dismiss stage Plaintiffs only have to allege the failure

---

[63] R. Doc. 8 at ¶¶ 115-16.
[64] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
[65] *Bennett v. City of Slidell*, 735 F.2d 861,862 (5th Cir. 1984).
[66] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).
[67] R. Doc. 17-1 at 19-20.

and provide enough factual support to make the allegation plausible.[68] Plaintiffs have done so and the Motion should be denied.

Here, Plaintiffs do not claim that the official policy regarding vehicle chases is unconstitutional, only that the implementation of it is and that Defendants were deliberately indifferent to enforcing the policy, which led to B.W.'s death. Defendants attempt to avoid liability by claiming that the officers' prior vehicle pursuits were isolated incidents and that Defendants were not even aware that they occurred.[69] That Defendants were unaware of the prior pursuits is hardly a shield to liability – in fact, that is indicative of the deliberate indifference which led to B.W.'s death. If Defendants had adequately supervised the officers, the crash could have been prevented.

NOPD's own internal investigatory unit found evidence of a custom that led to B.W.'s death, noting that that the officers had engaged "in a pattern and practice of purposeful violations of the pursuit policy."[70] The investigation further concluded that Defendant Nguyen, who was officer-defendants' supervisor, "did not possession the qualifications to provide strong, close, and effective supervision to a proactive unit" and even seemed to condone the officer-defendants' decision to turn off their body-worn and in-car cameras.[71] This failure by Defendant Nguyen to supervise his officers is especially concerning in light of his official charge by the department in taking over the unit, which specifically involved close monitoring of the officer-defendants due to their inexperience.[72] Such issues were ones noted not only in the Consent

---

[68] See, e.g., *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011).
[69] R. Doc. 17-1 at 17.
[70] PIB Report, at 40.
[71] PIB Report, at 26.
[72] R. Doc. 8 at ¶ 112.

12

Decree, but also the Consent Decree progress report which was issued two months before B.W.'s death.[73]

This speaks to the failure to train and discipline theory of liability. Municipal liability for failure to train or discipline occurs when "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."[74] Defendants claim that "[i]t is difficult to imagine what additional training would have prevented the subject incident,"[75] but considering the officers either did not know of the policy or did not considering their previous violations worth reporting, the training must be inadequate in some manner. Here, we know that B.W.'s death was not just a one-off example of misconduct in part <u>because Chief Ferguson has said so</u>. As described above, he has already conceded that B.W.'s death was caused "not just" by the decisions made on the night of his death.[76]

As discussed in the Complaint, NOPD policy lacks any meaningful mechanism by which Defendants can properly supervise their subordinates, and where that mechanism does exist Defendants are failing to catch constitutional violations to prevent them from happening again and again. For instance, NOPD Policy Chapter 41.3.8 § 35 reads:

> Supervisors shall review all In-Car Camera recordings of officers listed on any report involving injuries to detainees/prisoners or officers; uses of force **vehicle pursuits**; or misconduct complaints, as well as any recordings related to an event the officer believes may result in a misconduct complaint. The supervisor shall conduct any further investigation that he/she deems appropriate.

---

[73] R. Doc. 8 at ¶¶ 114-16.
[74] *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998).
[75] R. Doc. 17-1 at 13.
[76] R. Doc. 8 at ¶¶ 5, 87.

(emphasis added). Such a reactive policy – where oversight only occurs based on a report – allows officers to commit as many constitutional desires as they desire, so long as an injury is not documented in a report. Defendants, by their own policy, were deliberately indifferent to any number of vehicle pursuits that occurred prior to B.W.'s death, and the practice only allowed them the opportunity to discipline officers because it ended in tragedy. A less indifferent policy or practice could have prevented the pursuit of B.W. and therefore would have prevented his death.

Further, Defendants cannot feign ignorance to this deliberate indifference, as the Consent Decree Monitor report published two months prior to B.W.'s death put them on notice to the deficiencies and the pervasive issues still present in the department. In that report, the Consent Decree Monitor specifically highlighted NOPD supervisor evaluations as an area of concern and noted that NOPD supervisors were failing to incorporate knowledge from the reviews they had conducted in a way to prevent future constitutional violations. Specifically, the Report noted the following:

- Supervisors are not consistently following performance evaluation guidelines,
- Supervisors are not consistently preparing meaningful evaluations,
- Commanders are not adequately focused on remedying the gaps in evaluations, and
- Supervisors are paying inconsistent attention to issues as they are raised.[77]

The Report also found that the NOPD was not "in full and effective compliance" with the supervision requirements, in part due to "[f]orce statements and supervisor investigations of inconsistent quality."[78]

---

[77] Comprehensive Reassessment of the Consent Decree Monitor, OFFICE OF CONSENT DECREE MONITOR, Jan. 24, 2019, at 48; R. Doc. 8 at ¶¶ 115-16.
[78] *Id.* at 50.

    2.  Plaintiffs agree that Defendant Stephen Nguyen is not liable in his official capacity.

Defendants also argue that, for the purposes of *Monell* liability, Defendant Nguyen is not liable as he was not the final policymaker.[79] Plaintiffs agree and concede that the official capacity claims against Defendant Nguyen should be dismissed.

  D.  <u>This Court has jurisdiction over the state law claims as those are supplemental to Plaintiffs' well-plead federal claims.</u>

This Court has original jurisdiction to a number of Plaintiffs' claims, as they "aris[e] under the Constitution, laws, or treaties of the United States."[80] Because this Court has original jurisdiction, it also holds supplemental jurisdiction for all state law claims, including the state law torts and wrongful death claims.[81] Plaintiffs agree with Defendants that their "federal claims are premised on §1983, while Plaintiffs state law claims would be decided by Louisiana law and jurisprudence.[82] Because, for the reasons stated above, Plaintiffs have sufficiently plead their federal claims, this Court will continue to have supplemental jurisdiction over the state law claims.

This remains true in the event that this Court grants qualified immunity to the supervisory defendants. Qualified immunity is only a defense to damages – not declaratory relief – and therefore any Defendants found to be entitled to qualified immunity should not be dismissed from the case and supplemental jurisdiction should be preserved.[83] Further, federal claims against non-moving defendants remain, regardless of the outcome of this Motion to Dismiss. Therefore, this Court should not decline jurisdiction over the state law claims.

---

[79] R. Doc. 17-1 at 18.
[80] 28 U.S.C. § 1331; see also 28 U.S.C. § 1343(a)(3).
[81] 28 U.S.C. § 1367.
[82] R. Doc. 17-1 at 21.
[83] See, e.g., *Orellana v. Kyle*, 65 F.3d 29 (5th Cir. 1995); *Chrissy F. by Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir.1991).

## V. CONCLUSION

For the reasons stated herein, Plaintiffs have sufficiently alleged claims arising under § 1983 and the Motion to Dismiss should be denied.

Respectfully submitted,

Latoya Carney and Byron Wilson, Sr., by and through their counsel,

/s/ David Lanser
David Lanser, La. Bar No. 37764
William Most, La. Bar. No. 36914
201 St. Charles Ave., Ste. 114, #101
New Orleans, LA 70170
(504) 533-4521
David.lanser@gmail.com